

# TAX COURT OF NEW JERSEY

**JOSHUA D. NOVIN**
**Judge**

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS**

November 3, 2022

Edward P. Azar, Esq.
Law Offices of Edward P. Azar, L.L.C.
2840 Route 23 South
Newfoundland, New Jersey 07435

Anthony M. Ladouce, Esq.
DeCotiis, Fitzpatrick, Cole & Giblin, LLP
61 South Paramus Road, Suite 250
Paramus, New Jersey 07652

> Re: <u>North Jersey Police Radio Association, Inc. v. Borough of Pompton Lakes</u>
> Docket Nos. 009657-2018; 009672-2021; 005261-2022

Dear Mr. Azar and Mr. Ladouce:

This letter constitutes the court's opinion with respect to defendant, Borough of Pompton Lakes' ("defendant"), motions for summary judgment, and plaintiff, North Jersey Police Radio Association, Inc.'s ("NJPRA"), cross-motions for summary judgment. At issue is whether NJPRA is entitled to an exemption or partial exemption from local property taxes on its 300-foot radio broadcast mast, one-story communications equipment shed, and two-story communications equipment shed.

For the reasons explained more fully below, defendant's motions for partial summary judgment are granted, in part, and denied, in part, and NJPRA's cross-motions are denied.

## I. Procedural History and Findings of Fact

Plaintiff, North Jersey Police Radio Association, Inc. ("NJPRA"), was organized on or about October 2, 1940, as a New Jersey nonprofit corporation, under N.J.S.A. 15:1-1 (repealed

   

by the New Jersey Nonprofit Corporation Act, N.J.S.A. 15A:1-1 to 16-2).[1] NJPRA was also afforded tax-exempt status under Section 501(c)(4) of the Internal Revenue Code. See 26 U.S.C.A. §501(c)(4).[2] NJPRA's Certificate of Incorporation states that it was formed for the purpose of achieving the following goals:

> To own, maintain and operate an emergency radio transmitting and receiving station or stations for . . . transmitting and receiving police information and other information of interest or importance to the law enforcement agencies of the members hereof, and to such others as may lawfully benefit thereby, and to maintain agencies through which the transmission and receipt of such information may be carried on, and to carry on such operations as shall be intended to aid and assist, directly or indirectly, in the main purposes hereof . . .

Moreover, NJPRA's Constitution and Bylaws recite that NJPRA is "an association dedicated to the service of the people of . . . North Jersey, through increased efficiency in Police Radio Service." NJPRA's Constitution and Bylaws further detail purposes of:

> secur[ing] unity of action in all public safety matters among members and surrounding communities, which shall include, but not limited to, police, fire, ambulance[,] or any other public service organization, in need of assistance during an emergency situation. The assistance may be in the form of radio service, manpower, or equipment, whatever is needed to ensure the safe termination of the emergency condition.
>
> To secure a closer official and personal relationship among all public safety agencies, municipal, county, state and federal, throughout the North Jersey area.

---

[1] The Act applies to "every corporation without capital stock which was organized under or became subject to any heretofore enacted law of this State . . . , and which provided for the organization of a corporation or corporations for a purpose or purposes for which a corporation may be organized under this act." N.J.S.A. 15A:1-3(a)(2).

[2] A "[c]ivic league[] or organization[] not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, . . . and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes." 26 U.S.C.A. § 501(c)(4).






> To strive for advancement in all public safety communication equipment, always seeking to up-grade existing equipment, and when necessary, purchase new equipment for member communities, which will increase the efficiency of said member agency.

NJPRA's members consist of "the Chief Executive head and all of the officers of the police departments or other law enforcement agencies which, directly or through their municipal or other governmental organizations, are contributing to and participating in the maintenance and operation of the transmitting and receiving station. . . ." The initial members of the NJPRA comprised nine municipalities including Bloomingdale Borough, Butler Borough, Kinnelon Borough, Pompton Lakes Borough, Ringwood Borough, Riverdale Borough, Wanaque Borough, West Milford Borough, and the Wanaque Reservoir Police Department.[3]

To fulfill its purpose, NJPRA owns and maintains a 300-foot radio broadcast mast (the "radio broadcast mast"), a one-story communications equipment shed, and a two-story communications equipment shed (collectively, the "communications equipment sheds") erected on the real property at Tower Road, in Pompton Lakes Borough ("defendant"). The real property is owned by the Pompton Lakes Borough Municipal Utilities Authority ("PLBMUA").[4] The radio broadcast mast and communications equipment sheds are identified on defendant's municipal tax roll as Block 6702, Lot 46, Qualifier T02 (the "subject property").

NJPRA occupies the real property on which the radio broadcast mast and communications equipment sheds are erected under an easement recorded in deed book Y-81, page 654 of the Passaic County Register's Office. Pursuant to a Consent Order of Settlement

---

[3] It was unclear from the submissions which municipalities remained active members of NJPRA as of the valuation dates at issue.

[4] The real property was initially owned by defendant; however, it was deeded to the PLBMUA on or about January 2, 1965 (per Appraisal Consultants Corp. appraisal report dated November 6, 2021, annexed to defendant's motions as Exhibit D-5).






and Dismissal,[5] PLBMUA leased the land to NJPRA for "a term of twenty years, with the option of NJPRA to renew for successive periods of twenty years each; provided, however, that the lease shall terminate in the event that the tower shall cease to be used for cellular or radio communications." The "rent payable by the NJPRA to PLBMUA shall be the amount of real property taxes assessed against said tower by the Borough of Pompton Lakes." NJPRA remits rental payments to PLBMUA, who "in turn pay[s] the property taxes direct[ly] to the Tax Collector of Pompton Lakes."[6]

For the 2018, 2021, and 2022 tax years, defendant's municipal tax assessor levied a tax assessment of $1,858,800 on the subject property's improvements.[7] NJPRA timely instituted local property tax appeals challenging the subject property's 2018, 2021, and 2022 tax year assessments.

The radio broadcast mast is comprised of an upwardly tapering triangular open web/cross braced steel tower that is supported by three sets of steel guy wires. Each set of guy wires is attached to the radio broadcast mast at a different elevation. The guy wires extend to ground level anchor rods, which are approximately 180 feet from the base of the radio broadcast mast. The radio broadcast mast is attached to a reinforced concrete foundation that is approximately 16

---

[5] Filed February 14, 2005, under the captions: (i) Pompton Lakes Borough Municipal Utilities Authority v. North Jersey Police Radio Association, Inc., Nextel Communications, Inc., Superior Court of New Jersey, Passaic County, Chancery Division, docket number PAS-C-77-04; and (ii) North Jersey Police Radio Association, Inc. v. Pompton Lakes Borough Municipal Utilities Authority, Superior Court of New Jersey, Passaic County, Chancery Division, PAS-C-78-04.

[6] Paragraph 7 of the Consent Order of Settlement and Dismissal affords NJPRA "the right, in the name of PLBMUA, to appeal any tax assessment now or hereafter imposed by the Borough of Pompton Lakes against NJPRA's tower or against its accessory structures on the leased premises."

[7] Neither NJPRA nor defendant advanced any argument, nor offered any evidence, that the radio broadcast mast and/or communications equipment sheds were being taxed for the 2018, 2020, and 2021 tax years as real property under N.J.S.A. 54:4-1. Moreover, no evidence was presented that NJPRA's leasehold interest was being taxed under N.J.S.A. 54:4-2.3 or N.J.S.A. 54:4-1.10.






square feet and one foot thick, with footings extending approximately one-and-a-half feet deep. A variety of equipment (antennas, microwave dishes, etc.) are attached to the radio broadcast mast and a corresponding series of cables, wires, and conduits run from the radio broadcast mast to the communications equipment sheds.

The one-story communications equipment shed is a masonry building with a concrete floor and a gable frame composition shingle roof. The building is approximately ten feet in height and contains approximately 375 square feet of gross building area. The building has electrical service with overhead fluorescent lighting, is heated and cooled by a package HVAC unit, and has no plumbing. The two-story communications equipment shed is also a masonry building with a concrete floor and a flat built-up roof. The building is approximately eighteen feet in height and contains approximately 500 square feet of gross building area. The building has electrical service with overhead fluorescent lighting, is heated and cooled by a package HVAC unit, and has no plumbing. The radio broadcast mast and communications equipment sheds are surrounded by approximately ninety feet of six-foot-high chain link fencing topped with three strand barbed wire.

The subject property is equipped with a natural gas fired emergency generator that is owned/operated by one of NJPRA's tenants.[8] NJPRA does not have its own generator but maintains a connection box on the exterior of the one-story communications equipment shed for a portable generator.

NJPRA enters into Repeater Utilization Agreements with its member municipalities,

---

[8] It was unclear from the submissions whether the natural gas fired generator services both the one-story and two-story communications equipment sheds.






agreeing to furnish them with emergency communication repeater signal service.[9]  The Repeater Utilization Agreements require the member municipalities to furnish NJPRA with "a copy of their valid F.C.C. [Federal Communications Commission] license."  The Repeater Utilization Agreements further provide that if any member municipality's "F.C.C. license is suspended or revoked this agreement will be null and void."  Under the terms of the agreements, the emergency communication repeater signal service is for the use only of "members and the Emergency Services [departments] of the municipalities they represent."  Member municipalities are expressly prohibited from subletting the emergency repeater signal to any other entity.  The annual rent charge to each member municipality for the repeater signal service is $1.00.

In addition to the emergency repeater signal service, NJPRA leases portions of the radio broadcast mast and communications equipment sheds to its member municipalities, non-member municipalities, governmental authorities, nonprofit educational, nonprofit religious, and for-profit entities.[10]  Each Tower Lease Agreement provides that NJPRA permits the tenant "use of the tower for its radio communications."  The leases designate the height on the radio broadcast

---

[9]  A repeater is an "automatic radio-relay station, usually located on a mountain top, tall building, or radio tower.  It allows communication between two or more bases, mobile or portable stations that are unable to communicate directly with each other due to distance or obstructions between them.  The repeater receives on one radio frequency (the "input" frequency), demodulates the signal, and simultaneously re-transmits the information on its "output" frequency.  All stations using the repeater transmit on the repeater's input frequency and receive on its output frequency.  Since the repeater is usually located at an elevation higher than the other radios using it, their range is greatly extended."  https://en.wikipedia.org/wiki/Radio_repeater (last visited on October 14, 2022).

[10]  During the valuation dates involved herein, NJPRA entered into Repeater Utilization Agreements and/or Tower Lease Agreements for the radio broadcast mast and communications equipment sheds with: (i) Bloomingdale Police Department; (ii) Pompton Lakes Police Department; (iii) Riverdale Police Department; (iv) North Jersey Water District Supply Commission; (v) Pequannock Township Police and Fire Departments; (vi) Pompton Lakes Police Department, Fire Department and Office of Emergency Management; (vii) Preakness Valley Reformed Church; (viii) Wayne Township; (ix) William Paterson University; (x) Spok, Inc.; and (xi) Pacific Data Vision, Inc. dba pdv Wireless.






mast where the antenna/dish will be located and the square footage of the floor and/or wall areas in the communications equipment sheds where the communications equipment shall be maintained. The leases set forth the size parameters of the antenna and the weight and dimensions of the equipment. Moreover, each lease requires the tenant to furnish NJPRA with "a copy of their valid F.C.C. license, before the installation [of antenna and equipment] is started."[11] The leases further state that if the tenant's "F.C.C. license is suspended or revoked, the [t]enant's equipment will be removed from the site and placed into storage at the Tenant's expense and liability."[12]

On July 27, 2021, the court entered a Case Management Order (the "July 27, 2021 Case Management Order") directing NJPRA and defendant to exchange trial-ready expert reports and scheduling trial for November 18, 2021.[13]

By letter dated September 22, 2021, defendant's counsel requested an adjournment of the trial date. On September 28, 2021, the court issued a clerk's notice adjourning the trial date to November 29, 2021.[14]

---

[11] A copy of the Federal Communications Commission license for North Jersey Water District Supply Commission is annexed to their Tower Lease Agreement.

[12] For the 2018 year, NJPRA entered into Tower Lease Agreements with tenants maintaining equipment on the radio broadcast mast and in the communications equipment sheds in the following annual sums: (i) North Jersey Water District Supply Comm., $18,028.27; (ii) Pequannock Township Police/Fire Department, $12,564.97; (iii) Pompton Lakes Borough Police, Fire, and OEM Department, $11,437.48; (iv) Preakness Valley Reformed Church, $16,000; (v) Wayne Township, $73,051.09 (average); (vi) William Paterson University, $26,644.39; (vii) Spok, Inc., $25,213.95; and (viii) Pacific DataVision, Inc. dba pdv Wireless, $16,800. In addition, NJPRA entered into Repeater Utilization Agreements with the following tenants with a $1.00 annual rent: (i) Bloomingdale Police Department; and (ii) Riverdale Police Department.

[13] The Order was entered under docket numbers 009657-2018 and 009672-2021.

[14] On November 22, 2021, defendant filed motions in limine seeking to bar NJPRA from offering evidence of local property tax exemption eligibility for the tax years at issue. Defendant's motions argued that NJPRA failed to file an Initial Statement, under N.J.S.A. 54:4-






On November 22, 2021, defendant filed motions *in limine* arguing that because NJPRA failed to file an "Initial Statement" with defendant's municipal tax assessor prior to November 1st of the pretax years, NJPRA "lost its right to seek tax exempt status."[15]

On November 23, 2021, the court conducted a telephone conference call with NJPRA's counsel and defendant's counsel.[16] As a result of the telephone conference, the court adjourned

---

4, and therefore, NJPRA should be precluded from claiming an exemption for local property taxes. On November 23, 2021, the court conducted a telephone conference with counsel. During said telephone conference, defendant's counsel acknowledged that defendant was aware from discovery exchanged that NJPRA was asserting a claim of partial exemption from local property taxes. The court questioned defendant's counsel regarding the impact that the holdings in Blair Academy v. Blairstown, 95 N.J. Super. 583, 591 (App. Div. 1967) (stating that "[t]he failure of the municipal assessor to obtain the [initial] statements, which N.J.S.A. 54:4-4.4 makes it mandatory for him to obtain, should not deprive this nonprofit academy of the tax exemption to which it is entitled by law"); Emanual Missionary Baptist Church v. City of Newark, 1 N.J. Tax 264 (Tax 1980) (stating that "the assessor's failure to obtain the [initial] statement does not vitiate the exemption otherwise allowable"), had upon his motions in limine. The court further raised whether apportionment of local property tax exemption was permissible under N.J.S.A. 54:4-3.3. See Cty. of Essex v. East Orange, 214 N.J. Super. 568 (App. Div. 1987). Thus, the court adjourned the November 29, 2021 trial date and assigned the parties a schedule for submission of summary judgment motions addressing plaintiff's exemption claims.

[15] See Emanuel Missionary Baptist Church v. City of Newark, 1 N.J. Tax 264, 267-268 (Tax 1980) (concluding that "the assessor's failure to obtain the [initial] statement does not vitiate the exemption otherwise allowable"); Atlantic County New School, Inc. v. City of Pleasantville, 2 N.J. Tax 192, 196 (Tax 1981) (concluding that "the failure to file [an initial statement] on November 1 may not vitiate the exemption"); Center for Molecular Medicine and Immunology v. Twp. of Belleville, 19 N.J. Tax 193, 199 (Tax 2000) (concluding that the failure to file an initial statement is not "dispositive" of the exempt status of a property); Wellington v. Twp. of Hillsborough, 27 N.J. Tax 37, 54 (2012) (concluding that a "parcel's exempt status is determined by its use and not by the owner's compliance with exemption claim procedures").

[16] During the conference, the court emphasized that R. 4:25-8(a)(1) provides that a motion in limine is an application "returnable at trial for a ruling regarding the conduct of the trial, including admissibility of evidence, which . . . , if granted, would not have a dispositive impact on a litigant's case." R. 4:25-8(a)(1). See also Seoung Ouk Cho v. Trinitas Regional Medical Center, 443 N.J. Super. 461, 470-73 (App. Div. 2015), certif. denied, 221 N.J. 287 (2015) (stating that in evaluating the issues presented under a motion in limine seeking to bar the admission of evidence, the due process rights of the nonmoving party must be of paramount concern. When a motion in limine is equivalent to a summary judgment motion and requests an "objective that has the concomitant effect of rendering a . . . claim futile," the court should disfavor such rulings. Rather, such motion should be guided under the standards of R. 4:46






the November 29, 2021 trial date and subsequently assigned the parties dates for submission of summary judgment motions.

On May 13, 2022, defendant's counsel filed the instant motions for partial summary judgment, and on June 29, 2022, NJPRA's counsel filed the instant cross-motions for summary judgment.[17]

Defendant argues that summary judgment should be entered affirming the subject property's 2018, 2021, and 2022 tax years assessments because NJPRA does not use the subject property exclusively for public purposes under N.J.S.A. 54:4-3.3. Defendant additionally asserts that "the parties do not substantially contest the valuation of the [subject] property."[18] Moreover, defendant asserts that neither NJPRA nor any of its subtenants qualify for an apportioned local property tax exemption under N.J.S.A. 54:4-3.6.

Conversely, NJPRA maintains that the radio broadcast mast and communications equipment sheds are wholly exempt from local property taxation under N.J.S.A. 54:4-3.3. Specifically, NJPRA maintains that the radio broadcast mast and communications equipment sheds should be exempt from local property tax because they comprise an emergency communication repeater and radio transmitting and receiving station for local municipal emergency services and, therefore, serve a vital public purpose under N.J.S.A. 54:4-3.3. NJPRA concedes that during the tax years at issue it leased portions of the radio broadcast mast and communications equipment sheds to governmental, nonprofit religious, nonprofit educational,

---

requiring, absent a showing of good cause, that the motion be returnable before expiration of the discovery period, and not later than thirty days before the scheduled trial date).

[17] The return date of the motions for summary judgment and cross-motions for summary judgment were adjourned several times by the parties by mutual consent.

[18] At oral argument, NJPRA asserted that the subject property's assessed value is in dispute.




Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



and for-profit entities.[19] However, NJPRA argues that its leasing activities to the governmental, nonprofit religious, and nonprofit educational tenants should not defeat the local property tax exemption because those users would qualify for exemption under one or more categorizes enumerated under N.J.S.A. 54:4-3.6. Nevertheless, it contends that the rental income arising from its leasing activities to the for-profit entities (Spok, Inc. and Pacific DataVision, Inc. dba pdv Wireless) was "de minimis."

Alternatively, NJPRA argues that the portions of the radio broadcast mast and communications equipment sheds used by NJPRA and its member municipalities, including those portions leased to member and non-member municipalities' police, fire, and office of emergency management departments are: (i) "buildings actually used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children," under N.J.S.A. 54:4-3.6; and (ii) "buildings actually and exclusively used and owned by volunteer first-aid squads, which squads are or shall be incorporated as associations not for pecuniary profit," under N.J.S.A. 54:4-3.6. Moreover, NJPRA contends that the portions

---

[19] According to NJPRA's proposed valuation expert's report, for the 2018 tax year, NJPRA "subleased space on the subject property [for $1.00 annual rent] to the following non-profit [governmental] entities . . . Bloomingdale Police Department; Pompton Lakes Police Department; and Riverdale Police Department." Moreover, for the 2018 tax year, NJPRA "subleased space on the subject property to the following non-profit entities for the following amounts: North Jersey District Water Supply Commission [("NJDWSC")] ($17,334.87 per year); Pequannock Township Police/Fire Department ($12,081.71 per year); Pompton Lakes Police Department, Fire Department, and OEM ($10,987.96 per year); the Township of Wayne ($118,174,88 per year); William Paterson University Radio Station WPSC-FM [("WPU")] ($25,619.61 per year); and Preakness Valley Reformed Church [("PVRC")] ($16,640.00 per year)." Finally, for the 2018 tax year, NJPRA subleased portions of the radio broadcast mast and communications equipment sheds "to the following for-profit entities for the following amounts: Spok, Inc. ($24,244.18 per year); and Pacific DataVision, Inc. d/b/a pdv Wireless ($18,144.00 per year)." For the 2021 and 2022 tax years, NJPRA continued to sublease portions of the radio broadcast mast and equipment communications sheds to the same municipal government, non-profit, and for-profit entities with minor rent adjustments, excepting the NJWSC, which vacated in July 2018.






of the radio broadcast mast and communications equipment sheds leased to WPU are exempt from local property tax because WPU is a nonprofit public institution of higher education under N.J.S.A. 18A:62-1, and thus, such portions of the mast and sheds constitute a "building[] actually used for colleges." NJPRA further maintains that the portions of the radio broadcast mast and communications equipment sheds leased to PVRC are exempt from local property tax because PVRC is a nonprofit corporation organized exclusively for religious purposes, and thus, such portions of the mast and sheds constitute a "building[] actually used in the work . . . of corporations organized exclusively for religious purposes." Finally, NJPRA contends that the portions of the radio broadcast mast and communications equipment sheds leased to member and non-member municipalities and the NJDWSC constitute a "building[] actually used for . . . associations, . . . when owned by the State, county, or any political subdivision thereof," under N.J.S.A. 54:4-3.6.

In sum, NJPRA argues that only the portions of the radio broadcast mast and communications equipment sheds leased to the for-profit corporations should be subject to local property tax. Correspondingly, the portions of the radio broadcast mast and communications equipment sheds used by NJPRA, leased to its member municipalities, leased to non-member municipalities, and leased to WPU, NJDWSC, and PVRC should be exempt from local property tax under N.J.S.A. 54:4-3.6.

## II.   Conclusions of Law

### A.   Summary judgment

Summary judgment "'serve[s] two competing jurisprudential philosophies': first, 'the desire to afford every litigant who has a *bona fide* cause of action or defense the opportunity to fully expose his case,' and second, to guard 'against groundless claims and frivolous defenses,'






thus saving the resources of the parties and the court." Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 541-42 (1995)).

R. 4:46-2 outlines the circumstances under which summary judgment should be granted:

> if the pleadings, depositions, answers to interrogatories and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.
>
> [R. 4:46-2.]

In Brill, our Supreme Court adopted the federal approach to resolving motions for summary judgment, in which "the essence of the inquiry [is] whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." 142 N.J. at 536 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). In conducting this inquiry, the trial court must engage in a "kind of weighing that involves a type of evaluation, analysis and sifting of evidential materials." Ibid. The standard established by our Supreme Court in Brill is as follows:

> [W]hen deciding a motion for summary judgment under R. 4:46-2, the determination whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential material presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational fact finder to resolve the alleged disputed issue in favor of the non-moving party.
>
> [Id. at 536.]

In considering all the material evidence before it with which to determine if there is a genuine issue of material fact, the court must view most favorably those items presented to it by the party opposing the motion and all doubts are to be resolved against the movant. Ruvolo v.






American Casualty Co., 39 N.J. 490, 491 (1963). A court charged with "deciding a summary judgment motion does not draw inferences from the factual record as does the factfinder in a trial, . . . [i]nstead, the motion court draws all legitimate inferences from the facts in favor of the non-moving party." Globe Motor Co., 225 N.J. at 480 (internal citations omitted). Thus, the moving party bears the burden "to exclude any reasonable doubt as to the existence of any genuine issue of material fact" with respect to the claims being asserted. United Advertising Corp. v. Borough of Metuchen, 35 N.J. 193, 196 (1961).

"By its plain language, R. 4:46-2 dictates that a court should deny a summary judgment motion only where a party opposing the motion has come forward with evidence that creates a 'genuine issue as to any material fact challenged.'" Brill, 142 N.J. at 529. However, when the party opposing the motion merely presents "facts which are immaterial or of an insubstantial nature, a mere scintilla, fanciful, frivolous, gauzy or merely suspicious," then an otherwise meritorious application for summary judgment should not be defeated. Judson v. Peoples Bank and Trust Co., 17 N.J. 67, 75 (1954). Hence, "when the evidence is so one-sided that one party must prevail as a matter of law . . . the trial court should not hesitate to grant summary judgment." Brill, 142 N.J. at 540 (quoting Liberty Lobby, Inc., 477 U.S. at 252).

In applying the foregoing standards to the instant motions and cross-motions for summary judgment, and having reviewed the pleadings, certifications, and exhibits submitted in support of, and in opposition thereto, the court concludes that genuine issues of material fact are not in dispute with respect to the use of the subject property and exemption from local property tax under N.J.S.A. 54:4-3.3, and thus, that issue is ripe for summary judgment. However, for the reasons set forth herein, the court finds that questions of fact remain involving the character of the radio broadcast mast and communications equipment sheds, and the use of the radio






broadcast mast and communications equipment sheds, including who benefits from the surplus income generated by NJPRA, i.e., whether the surplus "can be traced into someone's pocket." Paper Mill Playhouse v. Millburn Twp., 95 N.J. 503, 522-23 (1984). Accordingly, the issue of NJPRA's exemption from local property tax, under N.J.S.A. 54:4-3.6, is not ripe for summary judgment.

### B.     Local Property Tax Exemptions

Unless expressly exempted by our Legislature, "[a]ll property real and personal . . . shall be subject to taxation annually. . . ." N.J.S.A. 54:4-1. As our Supreme Court has expressed, in considering the grant of a tax exemption, the legislature "must base tax exemptions on the property's use, not the owner's identity." Twp. of Holmdel v. New Jersey Highway Auth., 190 N.J. 74, 87 (2007). Tax exemption statutes, which are "based on the personal status of the owner rather than on the use to which the property is put, run afoul of" our State's Constitutional mandate that all property be "assessed for taxation under general laws and by uniform rules." New Jersey Turnpike Authority v. Twp. of Washington, 16 N.J. 38, 44-45 (1954).

The court's "interpretation of statutory tax exemption [provisions are] governed by principles of general statutory construction." Twp. of Holmdel, 190 N.J. at 87. Thus, tax exemptions "in favor of nongovernmental owners are strictly construed," and should not be expanded beyond the clear intent of our Legislature. Walter Reade, Inc. v. Twp. of Dennis, 36 N.J. 435, 440 (1962). See Deubel v. Kervick, 33 N.J. 568 (1960) (concluding that "[e]xemptions from taxation are to be strictly construed . . . , but of course strict construction does not mean a construction which begrudges. Rather it means an exemption shall not be extended beyond the ascertainable intention of the Legislature and hence an exemption must be denied if a purpose to grant it is doubtful."). Conversely, local property "tax immunities for government authorities






should be liberally construed because they facilitate the provision of public services." Twp. of Holmdel, 190 N.J. at 88. See also City of Newark v. Essex County Board of Taxation, 54 N.J. 171, 187 (1969); Twp. of Hanover v. Town of Morristown, 4 N.J. Super. 22, 24 (App. Div. 1949). This mindset is derived from the rationale that "[i]t would be strange for the Legislature to enable the [a]uthority to choose among several modes of rendering [a] public service and then encumber the choice with tax consequences." Walter Reade, Inc., 36 N.J. at 440.

Relevant here, NJPRA asserts that the subject property is wholly exempt from local property tax under N.J.S.A. 54:4-3.3, or partially exempt from taxation under N.J.S.A. 54:4-3.6. Each statutory exemption contains different criteria and therefore, requires a separate and distinct analysis by the court.

1. Exemption under N.J.S.A. 54:4-3.3

N.J.S.A. 54:4-3.3 provides that government property used for a public purpose is exempt from taxation. Specifically, it states, in part, that:

> . . . the property of the State of New Jersey; and the property of the respective counties and municipalities, and their agencies and authorities, school districts, and other taxing districts used for public purposes . . . shall be exempt from taxation under this chapter. . . .
>
> [N.J.S.A. 54:4-3.3.]

This provision has been interpreted as having two principal criteria: (i) that the property must be owned by the state or local government or its agencies/authorities; and (ii) that the property is used for a public purpose under some statutory authority. Additionally, our courts have also expressed that in evaluating the used for public purpose criteria, no apportionment of the property's use shall be permitted. Accordingly, any use of public property for a private purpose will "entirely preclude[] its exemption" under N.J.S.A. 54:4-3.3. Cty. of Essex v. E.






Orange, 214 N.J. Super. 568, 577 (App. Div. 1987).  See also County of Ocean v. Dover, 3 N.J. Tax 434 (Tax 1981) (concluding that "[w]hen there is to be an [exemption] apportionment, the Legislature has specifically provided for it.")

       a.     Used for public purpose

As expressed by our Supreme Court, "the concept of public purpose is a broad one. [I]t connotes an activity which serves as a benefit to the community as a whole, and which, at the same time is directly related to the functions of government." Roe v. Kervick, 42 N.J. 191, 207 (1964).  The definition of public purpose cannot be rigid, "it must expand when necessary to encompass changing public needs of a modern dynamic society. . . . In each instance where the test is to be applied the decision must be reached with reference to the object sought to be accomplished and to the degree and manner in which the object affects the public welfare." Ibid.

By design, "property employed primarily for a public use does not lose immunity because [an] agency incidentally derives some private business income from it." Borough of Moonachie v. Port of New York Authority, 38 N.J. 414, 427 (1962).  Our courts have "recognized that private lease agreements do not automatically forfeit an agency's tax immunity." Twp. of Holmdel, 190 N.J. at 88.  Rather, when "a government property or facility is leased to a private entity and the private entity operates the property or facility in accordance with the agency's statutory purpose, the tax immunity may still apply." Id. at 89 (emphasis added).  Thus, a government agency may "employ[] a private company to carry out its public purpose" without losing its tax exemption. Egg Harbor City v. Atlantic Cty., 10 N.J. Tax 7, 23 (1988).  Exemption from local property tax may be afforded under N.J.S.A. 54:4-3.3 "when the property is used for public purposes, either directly by the public entity or by a private party under a lease." Ctr. for Molecular Med. & Immunology v. Belleville Twp., 357 N.J. Super. 41, 49 (App. Div. 2003)






(citing <u>Port of New York Authority v. City of Newark</u>, 20 N.J. 386, 395-96 (1956)). However, the court's decision "turn[s] upon the intention of the Legislature in the statute creating the agency and providing for the exemption." <u>Walter Reade, Inc.</u>, 36 N.J. at 441. Stated differently, "the determinative inquiry is whether the property is utilized in furtherance of the agency's statutory mandate." <u>Twp. of Holmdel</u>, 190 N.J. at 88-89.

In enacting the Municipal and County Utilities Authorities Law, N.J.S.A. 40:14B-1 to -78, our Legislature expressed that public interests are served by, and it is the policy of the State of New Jersey to foster and promote by reasonable means, the provision of certain services for public use including, without limitation, water, collection and disposal of solid waste, sewer, and hydroelectric power. N.J.S.A. 40:14B-2. The Legislature further specifically conferred additional powers on municipal and county utility authorities, like the PLBMUA, including, the

> power to make reasonable regulations for the installation, construction, maintenance, repair, renewal, relocation and removal of tracks, pipes, mains, <u>conduits, cables, wires, towers, poles or any other equipment</u> and appliances . . . of <u>any public utility</u>, as defined in [N.J.S.A.] 48:2-13 . . . , in, on, along, over or under any real property, including public lands, waters, parks, roads, streets, highways, playgrounds and reservations.
>
> [N.J.S.A. 40:14B-40 (emphasis added).]

Moreover, N.J.S.A. 48:2-13 broadly defines a "public utility" to include

> every . . . corporation . . . , their successors, heirs or assigns, that now or hereafter may own, operate, manage or control within this State any railroad, street railway, traction railway, autobus, charter bus operation, special bus operation, canal, express, subway, pipeline, gas, electricity distribution, water, oil, sewer, solid waste collection, solid waste disposal, telephone or telegraph system, plant <u>or equipment for public use</u>, under privileges granted or hereafter to be granted by this State or by any political subdivision thereof.
>
> [N.J.S.A. 48:2-13 (emphasis added).]



NJPRA asserts that the radio broadcast mast and communications equipment sheds are "equipment for public use," and thus satisfy the criteria of a public utility. NJPRA maintains that the radio broadcast mast and communications equipment sheds constitute "an emergency radio transmitting and receiving station . . . for the purpose of transmitting and receiving police information and other information of . . . importance to the law enforcement agencies of the members hereof." It highlights that one of its primary goals is "secur[ing] unity of action in all public safety matters among members and surrounding communities, . . . includ[ing]. . . police, fire, ambulance or any other public service organization, in need of assistance during an emergency situation." Moreover, because the Legislature specifically granted municipal utility authorities, like the PLBMUA, the capacity to regulate, install, repair, and/or renew the right to maintain "conduits, cables, wires, towers, poles or any other equipment" for the public's benefit, NJPRA argues that it is fulfilling an agency's statutory purpose. Thus, its operation of the radio broadcast mast and communications equipment sheds meet the public use criteria.

Under N.J.S.A. 40:14B-40, our Legislature conferred expansive power on municipal utility authorities to regulate and oversee public utilities. Moreover, the Legislature broadly defined a public utility to include a corporation operating, maintaining, or controlling "equipment for public use." N.J.S.A. 48:2-13. However, the Legislature did not specifically delineate how municipal utility authorities must render those services, rather, it afforded them the ability to determine how best to provide those public services. Our Supreme Court has expressed the view that when the Legislature has conferred a governmental agency or authority with the ability "to choose among several modes of rendering this public service [it would be strange to] then encumber the choice with tax consequences." Walter Reade, Inc., 36 N.J. at 440. Moreover, our courts have concluded that a government agency may employ a private






company to carry out its public purpose and that the exercise of such discretion should not result in taxation. Egg Harbor City, 10 N.J. Tax at 28.

As our Supreme Court has expressed, the idea of what constitutes use for a public purpose should be broadly construed; "it connotes an activity which serves as a benefit to the community as a whole, and which, at the same time is directly related to the functions of government." Borough of Paramus v. Cty. of Bergen, 27 N.J. Tax at 230. Here, PLBMUA leased its real property to NJPRA to maintain the radio broadcast mast and communications equipment sheds. The operation of the radio broadcast mast and communications equipment sheds serve a use for a public purpose, i.e., providing local emergency service personnel (police, fire, office of emergency management) in member and non-member municipalities with access to an emergency radio broadcasting/signal station within the parameters outlined under N.J.S.A. 40:14B-40. Accordingly, the court is satisfied that NJPRA's operation of the radio broadcast mast and communications equipment sheds serve a use for a public purpose under N.J.S.A. 54:4-3.3.

     b.   Ownership by state, local government, and/or its agencies

In general, the property of a municipal utility authority is exempt from local property taxation. N.J.S.A. 40:14B-63 provides that,

> Every utility system and all other property of a municipal authority are hereby declared to be public property of a political subdivision of the State and devoted to an essential public and governmental function and purpose and, . . . shall be exempt from all taxes and special assessments of the State or any subdivision thereof.
>
> [N.J.S.A 40:14B-63.]

PLBMUA is a governmental agency created under N.J.S.A. 40:14B-63 and comprises a municipal utility authority responsible for overseeing the provision of water, sewer, and other






critical public services to the residents of the Borough of Pompton Lakes. Moreover, as stated above, PLBMUA is authorized by our Legislature the power to regulate the "installation, construction, maintenance, repair, . . . of tracks, pipes, mains, conduits, cables, wires, towers, poles or any other equipment and appliances . . . of any public utility, as defined in [N.J.S.A.] 48:2-13." N.J.S.A. 40:14B-40. Further, our Legislature has defined public utility to include companies maintaining "equipment for public use." N.J.S.A. 48:2-13.

Municipal utility authorities are also expressly afforded the power "to acquire, rent, hold, lease as lessor, use and dispose of other personal property for the purposes of the municipal authority." N.J.S.A. 40:14B-20. Thus, PLBMUA possesses the authority to enter into a long-term lease for its real property with NJPRA, allowing it to maintain the radio broadcast mast and the communications equipment sheds, which power is expressly authorized by the enabling statute and does not defeat the ownership requirement.

Additionally, our courts have long recognized that tenants holding long-term leasehold interests have been viewed as possessing a "freehold" interest in the land equivalent to fee ownership for purposes of real property taxation, valuation, and assessment. See N.J.S.A. 46:15-5(a); Lake End Corp. v. Rockaway Twp., 185 N.J. Super. 248, 256 (App. Div. 1982) (concluding that "99-year leaseholds are the equivalent of a fee ownership for the purposes of real property taxation, valuation and assessment."); Ocean Grove Camp Meeting v. Reeves, 79 N.J.L. 334 (Sup. Ct. 1910), aff'd, 80 N.J.L. 464 (E & A 1910) (concluding that "a long-term [lease] in land, renewable in perpetuity, conveys an ownership [interest] equivalent to a fee simple.").

Here, PLBMUA is a governmental agency charged with overseeing the provision of critical public services to the residents of the Borough of Pompton Lakes and is the owner of the real property on which the radio broadcast mast and communications equipment sheds are






erected. NJPRA, a private nonprofit entity, holds a lease to the real property which is renewable in perpetuity. Accordingly, the court is satisfied that PLBMUA's ownership and leasing of the real property to NJPRA satisfies the government ownership criteria.

      c.    Apportionment

Partial exemption from local property tax is not permitted under N.J.S.A. 54:4-3.3. Thus, property owned by a state or local government, or its agencies, and used for a public purpose may not be afforded an exemption from local property tax under N.J.S.A. 54:4-3.3, where it is also being used for a private purpose.

In Cty. of Essex v. East Orange, our Appellate Division considered whether apportionment between a public and private use of a property is appropriate under N.J.S.A. 54:4-3.3. 214 N.J. Super. 568, 577 (App. Div. 1987). Essex County leased portions of the four-story office building it owned to private nongovernmental tenants and sought partial exemption from local property tax under 54:4-3.3, asserting that it was entitled to exemption for the portions of the property which were being used for public purposes. Id. at 570. The court disagreed, finding no statutory basis for apportionment under N.J.S.A. 54:4-3.3. Id. at 577. After examining the statutory language under N.J.S.A. 54:4-3.3, the court concluded that "we infer a legislative intention that there be no apportionment when an exemption is claimed under N.J.S.A. 54:4-3.3[,] as that section does not authorize apportionment." Id. at 578. Although the court observed that N.J.S.A. 54:4-3.3 contains no exclusivity requirement, it expressed that "it seems clear that the use must be exclusive for there to be an exemption as otherwise property not used for public purposes will be exempt, a result not allowable under N.J.S.A. 54:4-3.3." Ibid.

Similarly, in Borough of Paramus v. Cty. of Bergen, 27 N.J. Tax 215, 217 (Tax 2013), the court was presented with two issues: (i) whether the operation of a county-owned hospital by






a private, for-profit management company renders the property subject to local property tax; and (ii) whether the leasing of portions of the hospital building to for-profit service providers precludes application of tax exemption under N.J.S.A. 54:4-3.3. In 1997, Bergen County transitioned management and administration of its public hospital to a third-party private for-profit management company. Ibid. In 2001, the management company leased portions of the hospital building to for-profit service providers. Ibid. Bergen County asserted that the hospital was entitled to exemption from local property tax under N.J.S.A. 54:4-3.3. Ibid. The court found that the management and operation of the hospital by the third-party manager did not impact the exempt status of the hospital because it continued to serve a vital public purpose. Id. at 234. However, in addressing the leasing of portions of the hospital building to for-profit service providers, the court denoted that N.J.S.A. 54:4-3.3 "does not allow a [property] to be used for both public and private purposes and to enjoy a tax exemption." Id. at 235. It emphasized that under N.J.S.A. 54:4-3.3, a local property tax assessment cannot be apportioned between the public and private use, stating, "we infer a legislative intention that there be no apportionment when an exemption is claimed under N.J.S.A. 54:4-3.3 as that section does not authorize apportionment." Ibid. (quoting Cty. of Essex v. East Orange, 214 N.J. Super. at 578).

Finally, in Cty. of Ocean v. Dover, 3 N.J. Tax 434 (Tax 1981), the court addressed whether leasing one-third of a county owned building to a non-exempt entity rendered the county's petition for exemption from local property tax invalid. The court observed that the county failed to demonstrate that any public purpose was being served by "the one-third of the building occupied by the private commercial tenant." Id. at 438. Importantly, the court concluded that "[w]hen there is to be an apportionment, the Legislature has specifically provided for it." Id. at 439. Because no apportionment was contemplated by the Legislature under

   

N.J.S.A. 54:4-3.3, the court denied exemption.

Here, it is undisputed that NJPRA subleased portions of the radio broadcast mast and communications equipment sheds to for-profit entities during the tax years at issue.[20] NJPRA's sublease of the subject property to for-profit entities precludes exemption from local property tax under N.J.S.A. 54:4-3.3. In sum, the court finds that NJPRA is not entitled to exemption from local property tax under N.J.S.A. 54:4-3.3, as its use and operation of the subject property is not exclusively for public purposes, and no apportioned exemption is permitted under N.J.S.A. 54:4-3.3. Accordingly, for the above-stated reasons, the court grants, in part, defendant's motion for partial summary judgment, dismissing with prejudice NJPRA's claims for exemption under N.J.S.A. 54:4-3.3; and denies NJPRA's cross-motion seeking entry of summary judgment with respect to its claims for exemption under N.J.S.A. 54:4-3.3.

2.    Exemption under N.J.S.A 54:4-3.6

Because exemption statutes represent a deviation from the principle that all property owners must equally shoulder their fair portion of the local property tax burden, tax exemption statutes for nongovernmental entities are strictly construed. Princeton Univ. Press v. Princeton Borough, 35 N.J. 209, 214 (1961); Boys' Club of Clifton, Inc. v. Jefferson Twp., 72 N.J. 389, 398 (1977); New Jersey Carpenters Apprentice Training & Educ. Fund v. Borough of Kenilworth, 147 N.J. 171, 177-78 (1996). Moreover, "all doubts are resolved against those seeking the benefit of a statutory exemption." Chester Borough v. World Challenge, Inc., 14 N.J. Tax 20, 27 (Tax 1994) (citing Teaneck v. Lutheran Bible Inst., 20 N.J. 86, 90 (1955)). Accordingly, the burden rests with the claimant to prove entitlement to local property tax

---

[20]  The court reaches no conclusion as to the impact of NJPRA's leasing of portions of the radio broadcast mast and communications equipment sheds to the nonprofit, private nongovernmental tenants, as scant evidence was offered regarding their actual use of the subject property.






exemption under N.J.S.A. 54:4-3.6.  Princeton Univ. Press, 35 N.J. at 21; New Jersey Carpenters

Apprentice Training & Educ. Fund, 147 N.J. at 177-78; Fields v. Trustees of Princeton Univ., 28

N.J. Tax 574, 585 (Tax 2015).

Our Supreme Court has explained that N.J.S.A. 54:4-3.6 "requires three criteria for

exemption, (1) [the owner of the property] must be organized exclusively for the [exempt

purpose]; (2) its property must be actually and exclusively used for the tax-exempt purpose; and

(3) its operation and use of its property must not be conducted for profit."  Hunterdon Med. Ctr.

v. Readington Twp., 195 N.J. 549, 561 (2008) (quoting Paper Mill Playhouse v. Millburn Twp.,

95 N.J. 503, 506 (1984) (alterations in original).  However, in 1985 our Legislature eliminated

the exclusivity requirement under the second prong.  See L. 1985, c. 395.  Nonetheless,

"application of the statutory test necessarily depends on the facts of each case."  Int'l Sch. Servs.,

Inc. v. W. Windsor Twp., 207 N.J. 3, 22 (2011).  Therefore, the court will separately address

each of the foregoing criteria, applying the facts of the instant matter to the standards

enumerated.

    a.    Organized exclusively

It is stipulated that NJPRA was organized as a New Jersey nonprofit corporation under

N.J.S.A. 15:1-1 (repealed by the New Jersey Nonprofit Corporation Act, N.J.S.A. 15A:1-1 to 16-

2).  Moreover, NJPRA's organizational documents, specifically its Certificate of Incorporation,

express a purpose of "own[ing], maintain[ing] and operat[ing] an emergency radio transmitting

and receiving station or stations for . . . transmitting and receiving police information . . . to the

law enforcement agencies of the members hereof. . . ."  Additionally, NJPRA is afforded no

discretion under its organizational documents to serve a purpose other than maintaining and






operating the radio broadcast mast and communications equipment sheds for the benefit of the law enforcement agencies of its member municipalities.

In addition, there is no dispute that NJPRA owns and is responsible for maintaining the radio broadcast mast and communications equipment sheds. Although certain property that is affixed to the radio broadcast mast or stored in the communications equipment sheds (antennas, dishes, communications equipment, generator, etc.) is owned by the tenants, NJPRA is the sole owner of the radio broadcast mast and communications equipment sheds. Therefore, for substantially the same reasons set forth above (see infra Section 1, subsection a), the court finds that NJPRA is the owner of the subject property and is a New Jersey nonprofit corporation organized exclusively for the tax-exempt purpose.

      b.    Actually used for the tax-exempt purpose

Consideration of this criteria requires the court to evaluate whether NJPRA's actual use of the radio broadcast tower and communications equipment sheds satisfies the parameters under the statutorily afforded exemptions.

NJPRA maintains that such uses and operation of the radio broadcast mast and communications equipment sheds are entitled to exemption from local property tax as "buildings actually used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children. . . ."[21] N.J.S.A. 54:4-3.6. Alternatively, it alleges that its use, and the use by the municipal government tenants, satisfies the exemption criteria as "buildings actually and exclusively used and owned by volunteer first-aid squads, . . ." N.J.S.A. 54:4-3.6.

---

[21] NJPRA also maintains that its member and non-member municipal government tenants use of the radio broadcast mast and communications equipment sheds satisfies this criterion.






Finally, NJPRA asserts that the use of the radio broadcast mast and communications equipment sheds by WPU, PVRC, and NJDWSC are entitled to exemption from local property tax under the following subsections of N.J.S.A. 54:4-3.6: (i) "all buildings actually used for colleges, schools, academies, or seminaries . . ."; (ii) "all buildings actually used in the work of associations and corporations organized exclusively for religious purposes, including religious worship, or charitable purposes, . . . ." and (iii) buildings actually used for . . . associations, . . . when owned by the State, county, or any political subdivision thereof."

First, the court will address the use and operation of the radio broadcast mast and communications equipment sheds by NJPRA.[22] As such, the court must analyze what services, functions, assistance, or actions comprise the moral and mental improvement of men, women, and children. Secondly, the court must consider whether the radio broadcast mast and communications equipment sheds constitute a "building" as such term is contemplated under N.J.S.A. 54:4-3.6.

1. Moral and mental improvement - NJPRA

Although the court must adhere to strict construction of N.J.S.A. 54:4-3.6, against those seeking exemption, "that principle does not justify distorting the language or the legislative intent" of a statute. Boys' Club of Clifton, Inc., 72 N.J. at 398. As cogently explained by our Appellate Division,

> the basic inquiry always is the legislative intent as expressed in the statute. To that end the construction, while strict, must always be reasonable, and words are not to be given a rigid scholastic interpretation when it appears that they were used in another sense.

---

[22] Before addressing the use of the radio broadcast mast and communications equipment sheds by NJPRA's tenants (including the member and non-member municipalities, WPU, PVRC, and NJDWSC), the court must first determine whether NJPRA's use satisfies the moral and mental improvement criteria under N.J.S.A. 54:4-3.6.






> The rule of strict construction must never be allowed to defeat the evident legislative design.
>
> [Princeton v. Tenacre Found., 69 N.J. Super. 559, 563 (App. Div. 1961).]

Here, NJPRA contends that its use of the radio broadcast mast and communications equipment sheds, to provide emergency repeater signal service to its member municipalities, amounts to vital "assistance" and "emergency services to the individuals" residing in those municipalities.[23]  Although NJPRA does not fully detail how those emergency services contribute to the moral and mental improvement of men, women, and children, NJPRA implies that the welfare, security, and mental well-being of the citizens in and served by those municipalities are promoted and improved by virtue of them knowing and trusting that the emergency services personnel are equipped with an effective and efficient means of communication should an emergency arise.

Defendant concedes that NJPRA owns and maintains the radio broadcast mast and communications equipment sheds that NJPRA "subleases [it] to a variety of government, non-profit and for-profit entities."  Interestingly however, defendant does not charge that NJPRA's use of the radio broadcast mast and communications equipment sheds does not provide a vital public service contributing to moral and mental improvement.  Rather, defendant argues that NJPRA applies a "broad and vague definition" of moral and mental improvement.  Moreover, defendant focuses on NJPRA's tenants' use, maintaining that it "has not established that any – much less all – of its tenants are organized exclusively for moral and mental improvement."

---

[23]  NJPRA similarly maintains that each member and non-member tenant municipality use the radio broadcast mast and communications equipment sheds to provide necessary and essential public services to the citizens of their municipality.






As our Supreme Court has keenly observed, "[t]here is no legislative delineation of the moral and mental improvement classification in the statute [N.J.S.A. 54:4-3.6] or its legislative history to serve as a definitive guide." Paper Mill Playhouse, 95 N.J. at 512-13. In Chester Theatre Grp. Of Black River Playhouse v. Borough of Chester, 115 N.J. Super. 360, 364 (App. Div. 1971), our Appellate Division characterized moral and mental improvement as "enrich[ing] the experience of its members and patrons and to ennoble and strengthen their character," id. at 365, and to "develop[] or better . . . the mental faculties." Id. at 364. Moreover, "[t]he moral and mental improvement classification has been applied to various public and civic organizations, which directly serve the public by contributing to the educational, cultural and spiritual development in society in general." Phillipsburg Riverview Org., Inc. v. Town of Phillipsburg, 26 N.J. Tax 167, 176 (Tax 2011), aff'd, 27 N.J. Tax 188 (App. Div. 2013) (citing Church Contribution Trust v. Borough of Mendham, 9 N.J. Tax 299, 308 (Tax 1987)).

In City of Elizabeth v. Bayway Cmty. Ctr., 19 N.J. Misc. 263 (1941), the New Jersey State Board of Tax Appeals concluded that taxpayer was a corporation formed for charitable purposes and that its use and operation of a center benefitted the moral and mental improvement of adults and children in the community. The court observed that the taxpayer,

> is an incorporated organization formed for purposes of charity, and the moral and mental improvement of adults and children residing in what is known as the Bayway section of the City of Elizabeth. The proof shows abundant fulfillment of those purposes, in a literal sense. The buildings and land under appeal . . . are exclusively used to house a veritable multitude of activities, too numerous to recount here in detail, charitable, social and educational in nature, for the benefit of thousands of working class families in the neighborhood of the property, at little or no cost whatever to such persons.
>
> [Ibid.]






Additionally, in Bloomfield v. Academy of Medicine, 47 N.J. 358 (1966), our Supreme Court concluded that a non-profit organization comprised of physicians and dentists, which maintained a library and meeting rooms, published a medical bulletin, and conducted symposiums available to members, was entitled to exemption from local property tax. The court observed that the taxpayer's library "is open to all who wish to use it . . . [and] is in fact used as Seton Hall University's medical library." Id. at 365. Moreover, although the court observed that due to the "advanced nature of some of the educational programs admittedly . . . attendance by members of the general public is not feasible. . . [the taxpayer] makes the educational benefits available to the public to the maximum degree possible." Ibid. Accordingly, the court found that the organization "performs an important public service through its activities which promote[s] 'the moral and mental improvement of men, women and children'" under N.J.S.A. 54:4-3.6.

The ideal that rendering an important public service promotes the moral and mental improvement of men, women and children was echoed by our Appellate Division in Int'l Sch. Servs., Inc. v. West Windsor Twp., 381 N.J. Super. 383 (App. Div. 2005). There the court expressed that in gauging whether the range of petitioner's activities satisfied the moral and mental improvement criteria, "the entity must 'perform[] an important public service through its activities which promote 'the moral and mental improvement of men, women and children,' . . . [however, whether the entity] has actually done so is an issue to be resolved through the application of the facts to the second prong of the Paper Mill Playhouse test. . . ." Id. at 388.

Here, the court's review of NJPRA's Certificate of Incorporation discloses that it was "formed . . . to own, maintain and operate an emergency radio transmitting and receiving station or stations for the purpose of transmitting and receiving police information and other information






of interest or importance to the law enforcement agencies of the members hereof. . . ."

Moreover, the Certificate of Incorporation provides that "membership of the Association shall consist of the Chief Executive head and all of the officers of the police departments . . . which, directly or through their municipal or other governmental organizations, are contributing to and participating in the maintenance and organization of the transmitting and receiving station. . . ."

NJPRA's Constitution and Bylaws further detail purposes of:

> secur[ing] unity of action in all public safety matters among members and surrounding communities, which shall include, but not limited to, police, fire, ambulance[,] or any other public service organization, in need of assistance during an emergency situation. The assistance may be in the form of radio service, manpower, or equipment, whatever is needed to ensure the safe termination of the emergency condition.

> To secure a closer official and personal relationship among all public safety agencies, municipal, county, state and federal, throughout the North Jersey area.

> To strive for advancement in all public safety communication equipment, always seeking to up-grade existing equipment, and when necessary, purchase new equipment for member communities, which will increase the efficiency of said member agency.

Moreover, the court's examination of the extrinsic evidence, specifically the Repeater Utilization Agreements between NJPRA and its member municipalities, discloses that each member municipality is required to maintain a valid Federal Communications Commission license. As explained by the United States District Court, in enacting the Federal Communications Act of 1934, 47 U.S.C.S. §151 to 163 (the "Act"), "Congress did give consideration to the use of radio by governmental safety agencies, such as police and fire departments." United States v. Fuller, 202 F. Supp. 356, 359 (N.D. Cal. 1962). One of the principal goals enumerated under the Act was the creation of the Federal Communications






Commission, entrusted with "obtaining maximum effectiveness from the use of radio and wire communications in connection with safety of life and property. . . ." 47 U.S.C.S. § 154. The court further observed that,

> the Federal Communications Commission has set up a comprehensive set of regulations for public safety radio services, which include police and fire agencies . . . The purpose of the regulations was 'to provide a service of radio-communication essential either to the discharge of non-federal governmental functions relating to the public safety or the alleviation of an emergency endangering life or property' . . . police radio service is described as 'A Public Safety service of radio communication essential to official police activities.'
>
> [Fuller, 202 F. Supp. at 359.]

Moreover, in Smart Smr. v. Borough of Fair Lawn Bd. of Adj., 152 N.J. 309 (1998), our Supreme Court considered whether construction of a communications tower satisfied the positive criteria for granting a use variance under N.J.S.A. 40:55D-70(d). Although the Court flatly rejected the principal that construction of a communications tower was an "inherently beneficial use," the Court observed that issuance of an FCC license could satisfy the first requirement of the positive criteria, that the tower serves the welfare of the general public. The Court stated, "[g]enerally, the issuance of an FCC license should suffice for a carrier to establish that the use serves the general welfare." Id. at 336.

Here, the court finds that NJPRA's mission promotes the mental well-being, welfare, and public safety of the residents of its member municipalities. It accomplishes this goal by maintaining the radio broadcast mast and communications equipment sheds for use by the police and emergency services personnel of its municipality members. Each NJPRA member municipality is required to maintain an FCC license to transmit and receive an emergency signal. Thus, NJPRA uses the radio broadcast mast and equipment communications sheds to furnish its






member municipalities with emergency communication repeater signal service. Moreover, the public has a reasonable expectation that the police and fire department personnel serving their state and localities will have reasonable access to necessary communications to confront emergency situations. Therefore, the court concludes that NJPRA's use and operation of the radio broadcast mast and communications equipment sheds for emergency communication repeater signal service satisfies the moral and mental improvement criteria under N.J.S.A. 54:4-3.6.

### 2. Building

NJPRA argues that the radio broadcast mast and communications equipment sheds are a "building," as such term is construed under N.J.S.A. 54:4-3.6. In support of such view, NJPRA asserts that a "building can mean any booth, vehicle, boat or aircraft or other structure adopted for accommodation of persons or carrying on business."[24]

Defendant's briefs offer no meaningful opposition to NJPRA's characterization of the radio broadcast mast and communications equipment sheds as a building. To the contrary, defendant seemingly agrees that the radio broadcast mast and communications equipment sheds should be characterized as a "building," arguing in part, that NJPRA is not a "volunteer first-aid squad[], so the building is not 'exclusively . . . owned by volunteer first-aid squads'" (emphasis added).

However, "the court is 'not bound by an unreasonable or mistaken interpretation of [a statutory] scheme, particularly one that is [or may be] contrary to legislative objectives. Haley v.

---

[24] NJPRA's counsel offered no citation for this proposed definition. However, the court's research disclosed a substantially similar definition contained under Oregon's criminal code, defining a building as "any booth, vehicle, boat, aircraft or other structure adapted for overnight accommodations of persons or for carrying on business therein. . . ." ORS § 164.205(2).






Bd. of Review, Dept. of Labor, 245 N.J. 511, 520 (2021) (quoting McClain v. Bd. of Review, 237 N.J. 445, 456 (2019)).  In these matters, the court reviews and analyzes the Legislature's goals and purposes in enacting N.J.S.A. 54:4-3.6, mindful that tax exemption statutes for nongovernmental entities must be strictly construed.

In New Jersey, for local property tax purposes, our statutes differentiate between real property and personal property.  See N.J.S.A. 54:4-1.  Real property includes all land and improvements, including personal property affixed to the real property, unless:

> (a)(1) [t]he personal property so affixed can be removed or severed without material injury to the real property;
> (2) [t]he personal property so affixed can be removed or severed without material injury to the personal property itself;
> (3) [t]he personal property so affixed is not ordinarily intended to be affixed permanently to the real property; or
>
> (b) [t]he personal property so affixed is machinery, apparatus, or equipment used or held for use in business and is neither a structure nor machinery, apparatus or equipment the primary purpose of which is to enable a structure to support, shelter, contain, enclose or house persons or property.
>
> [N.J.S.A. 54:4-1.]

Moreover, our State's legal authorities have drawn a distinction between the taxation of radio and broadcast towers used to support transmission antenna, NYT Cable TV, a Div. of New York Times Co. v. Borough of Audubon, 230 N.J. Super. 530, 553 (App. Div. 1989), and radio towers that are responsible for radiating the broadcast signal.  Emmis Broad. Corp. of N.Y. v. E. Rutherford Borough, 14 N.J. Tax 524, 534 (1995), aff'd, 16 N.J. Tax 29 (App. Div.), certif. denied, 147 N.J. 263 (1996).  The former line of cases has concluded that the radio broadcast "tower is of a type 'ordinarily intended to be affixed permanently to real property' and is thus not exempt from real property taxation by N.J.S.A. 54:4-1a(3)."  NYT Cable TV, a Div. of N.Y.






Times Co., 230 N.J. Super. at 534. Conversely, the latter line of cases concluded that under the Business Retention Act, N.J.S.A. 54:4-1.13 to 2.13, where "[t]he towers are . . . the antenna . . . within the meaning of N.J.S.A. 54:4-1.15, the towers are machinery, apparatus, or equipment," held for use in business, and therefore, exempt from local property taxation. Emmis Broad. Corp. of N.Y., 14 N.J. Tax at 533.[25]

Moreover, although "no definition [of building] is contained in the exemption statute," our courts have adopted a two-part analysis to gauge whether a structure is a "building" under N.J.S.A. 54:4-3.6. Salvation Army v. Alexandria Twp., 2 N.J. Tax 292, 297-300 (Tax 1981) (citing Children's Seashore House v. Atlantic City, 68 N.J.L. 385, 389-90 (E. & A. 1902)). In Children's Seashore House, the court viewed the first part of the analysis as a structural test, where the court considered whether the structure "which is built; [is it] a fabric or edifice constructed, as a house, a church." 68 N.J.L. at 389. If the structure satisfies the first test, the court expressed that it may nevertheless not constitute a building under the second part of the analysis, which it viewed as the functional test. Under the statutory scheme, the court regarded the functional test as an analysis of the purpose that the building was intended to perform. Specifically, whether the structure was "intended . . . [to function] as would comfortably house the class of persons to be benefitted by the charity and the officers and agents who were to administer the same." Id. at 390. The court highlighted that the statute's inclusion of "the furniture and personal property used therein" and "the land . . . necessary to the fair enjoyment"

---

[25] Despite the distinction drawn between the radio broadcast towers, our courts have consistently reached the conclusion that the foundations or concrete bases supporting the radio broadcast towers, "are permanently affixed to the land and cannot be removed without material injury to themselves . . . they cannot be disassembled and moved . . . their function is only to support the tower antennas. Thus, the bases become taxable as real property." Emmis Broad. Corp. of N.Y., 14 N.J. Tax at 534.






thereof, demonstrated that a building's function "was to be the principal factor in the statutory scheme." Ibid.

Moreover, in Fairleigh Dickinson University v. Florham Park Borough, 5 N.J. Tax 343 (Tax 1983), the court recognized the dichotomy that exists between temporary and permanent structures. It found that two gazebos were not separate structures but rather should be included as parts of the mansion. Moreover, it held that the three guard houses were "not buildings," because no evidence was offered that they "were of sufficient permanence to be considered buildings." Id. at 356.

The concept that an improvement's permanence is pivotal in discerning whether it constitutes real property under N.J.S.A. 54:4-1, was reinforced by our Supreme Court in R.C. Maxwell Co. v. Galloway Twp., 145 N.J. 547 (1995). There, the Court stated that N.J.S.A. 54:4-1 "makes sense only when 'improvement' is construed as an addition to land that is obviously, unmistakably, and inherently permanent." Id. at 555.

Here, no evidence was offered by either NJPRA or defendant that NJPRA's radio broadcast mast functioned: (i) solely as a support mechanism for the antenna attached thereto, (ii) as a device that radiated the broadcast signal, or (iii) as a hybrid of the two. Accordingly, the court is unable to determine whether the radio broadcast mast is taxable as real property under N.J.S.A. 54:4-1 or exempt under N.J.S.A. 54:4-1.15 as "machinery, apparatus, and equipment" used or held for use in business. If the radio broadcast mast and communications equipment sheds are characterized as being affixed to the real property and not able to be removed without material injury to themselves or the real property, such view could materially impact the court's structural analysis under the two-part test set forth under Children's Seashore House. Moreover, if the radio broadcast mast and communications equipment sheds are depicted as personal






property under N.J.S.A. 54:4-1, their operations and inter-relationship could materially alter the court's functional analysis under the Children's Seashore House two-part test. In addition, no evidence was presented regarding the permanence of the radio broadcast mast or communications equipment sheds. Such evidence could shape the court's view on whether, either individually or collectively, they amount to a building as such term is construed under N.J.S.A. 54:4-3.6.

Accordingly, because material and genuine issues of fact about the radio broadcast mast and communications equipment sheds are omitted from the motion record, the court is unable to determine whether they constitute a building as such term is construed under N.J.S.A. 54:4-3.6. Therefore, defendant's motions for summary judgment under N.J.S.A. 54:4-3.6 and NJPRA's cross-motions for summary judgment under N.J.S.A. 54:4-3.6, are denied.

### 3. Tenants

NJPRA further submits that its leasing activities to the member and non-member municipalities, NJDWSC, WPU, and PVRC, render those portions of the radio broadcast mast and equipment communications sheds exempt from local property tax.

Specifically, NJPRA argues that the member and non-member municipalities, including the NJDWSC, "do in fact provide assistance, moral and mental improvement for men, women and children." Moreover, NJPRA maintains that because WPU is an institution of higher education in New Jersey, it "satisfies the first prong under the statute [N.J.S.A. 54:4-3.6] that the . . . tower is used for colleges, schools, academics or seminary's [sic]." Further, because PVRC is a New Jersey nonprofit religious corporation, the portions of the radio broadcast mast and equipment communications sheds used by PVRC satisfy N.J.S.A. 54:4-3.6's criteria as a "building[] actually used in the work . . . of corporations organized exclusively for religious






purposes."

Here, the court finds that NJPRA's member and non-member municipal Tower Lease Agreement lessees (Pequannock Township, Borough of Pompton Lakes, and Wayne Township) are municipal bodies corporate of the State of New Jersey.[26]  Moreover, the court finds that WPU is a public institution of higher education of the State of New Jersey.  See N.J.S.A. 18A:62-1.  The court further finds that NJDWSC is a corporate and public body of the State of New Jersey.  See N.J.S.A. 58:5-1.  Finally, it is stipulated by defendant that PVRC is a New Jersey non-profit religious corporation.

However, the status of an organization does not invariably lead the court to the conclusion that it is exempt from local property tax.  As expressed by our Supreme Court, we "must base tax exemptions on the property's use, not the owner's identity."  Twp. of Holmdel v. New Jersey Highway Auth., 190 N.J. 74, 87 (2007).  Tax exemptions that are afforded "based on the personal status of the owner rather than on the use to which the property is put, run[s] afoul of" our State's Constitutional mandate that all property be "assessed for taxation under general laws and by uniform rules."  New Jersey Turnpike Authority v. Twp. of Washington, 16 N.J. 38, 44-45 (1954).

Here, NJPRA erroneously focuses on the tenant's status and fails to appreciate N.J.S.A. 54:4-3.6's requirement that it must demonstrate actual use entitled to exemption.  NJPRA has offered no evidence regarding how or for what purposes its member and non-member municipalities, WPU, NJDWSC, or PVRC, make actual use of the subject property.  Although NJPRA asserts, and defendant concedes, that several tenants are governmental entities and non-

---

[26] No evidence was adduced in the records whether these municipal corporations were organized under N.J.S.A. 40A:1-1, N.J.S.A. 40:69A-1, or N.J.S.A. 40:70-1.






profit corporations, an entity's status does not automatically result in an exemption from local property tax. Without evidence with respect to the organization of these entities and the purposes for which they make actual use of the radio broadcast mast and communications equipment sheds, the court is unable to gauge whether same qualify for exemption from local property tax under N.J.S.A. 54:4-3.6.

Finally, the court finds NJPRA's arguments that the radio broadcast mast and communications equipment sheds comprise, (i) "buildings actually used for . . . associations, . . . when owned by the State, county, or any political subdivision thereof," or (ii) "buildings actually and exclusively used and owned by volunteer first-aid squads, which squads are or shall be incorporated as associations not for pecuniary profit," are without merit. It is undisputed that the radio broadcast mast and communications equipment sheds are the property of NJPRA, a New Jersey nonprofit corporation, and thus, do not represent property that is owned by the State, county, or any political subdivision thereof. Moreover, NJPRA is not a volunteer first-aid squad as such term is contemplated under N.J.S.A. 54:4-3.6.

### III. Conclusion

For the foregoing reasons, the court grants defendant's motions for partial summary judgment under N.J.S.A. 54:4-3.3 and denies defendant's motions and NJPRA's cross-motions for summary judgment under N.J.S.A. 54:4-3.6.

The court will issue an Order memorializing the conclusions reached in this opinion.

Very truly yours,

/s/ JUDGE JOSHUA D. NOVIN, J.T.C.

Hon. Joshua D. Novin, J.T.C.




